753 P.2d 1199

**CITY OF SOUTH TUCSON,**
Petitioner Employer,

**State Compensation Fund,**
Petitioner Carrier,

v.

The **INDUSTRIAL COMMISSION OF ARIZONA,** Respondent,

**James Krause, Respondent Employee.**

No. 1 CA–IC 3798.

Court of Appeals of Arizona,
Division 1, Department D.

April 14, 1988.

Robert K. Park, Chief Counsel State Compensation Fund by Mark R. Christensen, Tucson, for petitioners employer and carrier.

Dennis P. Kavanaugh, Chief Counsel Industrial Com'n of Arizona, Phoenix, for respondent.

Tretschok, McNamara & Clymer, P.C. by Patrick R. McNamara, Tucson, for respondent employee.

## OPINION

CONTRERAS, Judge.

This is a special action review of an Industrial Commission award excusing a late protest and awarding workers' compensation benefits to claimant who, when injured, was a prisoner working for a political subdivision of the state pursuant to an intergovernmental agreement between the political subdivision and the Arizona Department of Corrections (ADOC). Two issues are presented for review: (1) whether the statutory exclusion of workers' compensation coverage to specified prisoners applies to this case; and (2) whether the late protest was unexcused as a matter of law because the notice of claim status was mailed to the last known mailing address as shown on the records of the Commission. We conclude that the statutory exclusion applies to this case and is constitutional. Accordingly, on this basis alone, we set aside the award.

The respondent employee (claimant) was incarcerated with ADOC for his second felony conviction. In approximately November 1985, the ADOC accepted the claimant's request for work release and transferred him to the Southern Arizona Correctional Release Center (SACRC). In approximately December 1985, SACRC personnel assigned the claimant to work for the petitioner employer, the City of South Tucson (City).

The City and ADOC had previously entered into a written intergovernmental

agreement concerning work assignments of inmates to public works projects, including normal property maintenance. *See generally* A.R.S. §§ 11–952, 31–252, 41–1624.01. The City, in its contractual capacity as "contractor," agreed, among other things, to supervise the work of inmates, to pay $.50 for each hour of inmate service in care of ARCOR,[1] and to provide necessary first aid or hospitalization for accident or serious illness occurring while the inmate was working. The parties also agreed that the City would be liable "only for injuries resulting from its or its employees['] ordinary negligence in the oversight of recognized contractual responsibilities."

The claimant worked for the City's Department of Sanitation assisting a refuse truck driver on his normal collection route. On February 18, 1986, while aligning a dumpster with the truck, the claimant twisted his back. Although he was able to complete his shift without obvious difficulty, by the next morning he was in severe pain. He was unable to work, and SACRC personnel transported him to a hospital emergency room located in Tucson.

While at the hospital, the claimant partially completed the worker's report section of a standard workers' compensation claim form. He listed SACRC's street address as his current address without mentioning either SACRC itself or ADOC. He listed the City as his employer. He also signed this report. Above the signature line, the report included the following notice:

BY THIS INSTRUMENT I MAKE APPLICATION FOR ALL BENEFITS TO WHICH I MAY BE ENTITLED UNDER THE LAW ... I UNDERSTAND I MUST FOLLOW THE INSTRUCTIONS OF MY DOCTOR AND MUST HAVE WRITTEN APPROVAL FROM THE INDUSTRIAL COMMISSION TO LEAVE THE STATE OF ARIZONA OR MY LOCALITY. FAILURE TO DO SO MAY

CAUSE FORFEITURE OF COMPENSATION BENEFITS.

The next day, the ADOC transferred the claimant from SACRC to prison. The claimant never informed the Industrial Commission of this change of address. According to the claimant, he remained symptomatic but did not get additional medical treatment until September 1986.

The City's compensation carrier, the State Compensation Fund (Fund), received a March 3, 1986 letter from SACRC's administrator, which listed the claimant's ADOC file number and stated as follows:

I am returning your Employer's Report of Industrial Injury for ... [the claimant because he] was an inmate under the jurisdiction of the Arizona Department of Corrections when this injury occurred. [The claimant] was assigned to a work project at the City of South Tucson through an ARCOR project while assigned to this facility. As such, it is my understanding he is not eligible for workman's [sic] compensation.

On March 12, 1986, the Fund issued a notice of claim status denying compensability because the claimant was not an employee of the City. It mailed this notice and an acknowledgement card to the claimant at the address listed on the worker's report. Both the notice and the card were returned to the Fund with the notation "RETURNED TO SENDER/NO FORWARDING ADDRESS." A handwritten notation on the notice indicated that "unable to remail 104 of 3–12–86 to Clt as no other address to remail it to." From our review of the record, it appears the Fund made no further effort to locate or notify the claimant.

In September 1986, a prison medical assistant referred the claimant to Roy Richard Gettel, M.D., who eventually diagnosed

1. ARCOR is an acronym for the Arizona Correctional Enterprises. *See* former A.R.S. § 41–1621, which has been amended by Laws 1987, ch. 358, § 3. ARCOR is now referred to in the statute as Arizona Correctional Industries, but we will refer to it as ARCOR, which was the title used at the time this claim arose. The statutes governing ARCOR authorize the ADOC director to "contract with any ... political subdivision ... to provide services or labor rendered by prisoners." A.R.S. § 41–1624.01(B). A city is a political subdivision of the state. *See City of Phoenix v. Collar, Williams & White Eng'g, Inc.,* 12 Ariz.App. 510, 472 P.2d 479 (1970).

a herniated disk. An independent medical examiner subsequently confirmed the diagnosis.

In approximately October 1986, the claimant was released from prison. After being released claimant telephoned the Industrial Commission and discovered that the Fund had denied benefits. On October 29, 1986, 141 days after the protest period had expired, the claimant filed a hearing request. After a hearing was scheduled, the claimant retained his present counsel.

The initial hearing was limited to the issues of untimeliness and the claimant's entitlement to compensation benefits. The witnesses included the claimant, the claims representative who processed the claim, the city manager of South Tucson, and the driver who worked with the claimant. Their testimony supported the history summarized above. The following additional details are relevant.

The claimant testified that he was generally familiar with workers' compensation but had not filed a previous claim for benefits. Worker's Compensation coverage had not been discussed when he started work for the City. He nevertheless assumed that he was covered because standard notices concerning compensation coverage were posted at work. He also testified that he did not realize that the form he had completed at the hospital was a claim for workers' compensation benefits. Although he admitted signing the form, he explained that he had not read the printed notice which appeared on the form. He stated that at the time he was in pain and he thought it was necessary to receive treatment at the hospital. For this same reason, the claimant had not notified the Industrial Commission of his change of address. (The claimant was not asked why he contacted the Industrial Commission in October 1986 if he believed he had not filed a claim.)

The claims representative explained why she had not made a second attempt to notify the claimant even though she knew that he was in ADOC custody:

A We are only responsible to send it to the address that we have in the file.

Q Is that a State Compensation Fund internal rule of some kind?

A We mail it to the last-known address of the Claimant. Before we check the address in our claim file, it has to go to the Claimant, itself [sic]. We cannot send it to a member of his family or anyone else.

Q Even if you know where he is?

A Even though we know where he is. We mail it to the last-known address of the Claimant.

The city manager described the purpose of the intergovernmental agreement as follows:

Well, the purpose is typical of most contracts. It delineates responsibilities of the two parties that are working together to access each other's benefits— in this case, the Department of Corrections and referring to SACRC individuals who are being utilized in a manner, and employed by the Department of Corrections, which is trying to provide a transitional re-entrance into society.

On [the] other end, ourselves, we are taking advantage of their skills at a rate of pay that is agreed to by both parties and helps the community. So that is the basis of the agreement between the two.

After an additional hearing for medical evidence, the administrative law judge issued an award for a compensable claim. He excused the untimely filing, relying exclusively on A.R.S. § 23–947(B)(3). He also found that the City had "contracted with the Department of Corrections, SACRC, to provide employees, and that the ... [claimant] was contracted out as an employee to the ... [City], who amongst other things, is in the business of providing refuse collection for its constituents." Without further analysis, the administrative law judge concluded that the claim was compensable and awarded standard medical and disability benefits. After affirmance on administrative review, this special action followed.

On review, the City and Fund assert that the administrative law judge ignored two applicable statutory provisions, both of which barred the claimant's claim for work-

ers' compensation benefits. The first argument concerns former A.R.S. § 31–254(I).[2] The second argument concerns A.R.S. § 23–947(C). We address these arguments in reverse order.

■ A hearing request must be filed within ninety days after a notice is sent. *See* A.R.S. § 23–947(A). A late filing may be excused if the "person to whom the notice is sent shows by clear and convincing evidence that the notice was not received." A.R.S. § 23–947(B)(3). But this excuse does not apply "if it is shown by clear and convincing evidence that the notice was sent by mail ... to the last known mailing address ... of the person to whom it is addressed ..., as shown on the records of the commission." A.R.S. § 23–947(C).

In the present case, the administrative law judge applied paragraph B but ignored paragraph C. The City and Fund argue that paragraph C directly applies to the current case because the notice was mailed to the claimant at "his first, last, and only known mailing address."

We disagree that the Fund's abbreviated effort to notify the claimant satisfied paragraph C. The Fund had information about the claimant's address from two sources: the worker's report and the March 1986 letter from SACRC's administrator. This letter disclosed on its face that the address listed on the worker's report and SACRC's address were one and the same. The letter also provided the claimant's ADOC identification number. The Fund therefore could readily have used this information when it first attempted to notify the claimant. More importantly, after it became apparent that the first mailing had failed to reach the claimant, the Fund could have used the additional information to make a second attempt to notify the claimant at his last known mailing address but in care of SACRC's administrator. Because of the

Fund's failure to make this reasonable effort and the uncontradicted lack of notice to the claimant, we conclude that the administrative law judge properly excused the late filing.

■ We turn now to the substantive bar to the claimant's claim. The statutory exclusion provides as follows:

Nothing in this section is intended to restore, in whole or in part, the civil rights of any prisoner. *No prisoner compensated under this section* shall be considered as an employee or to be employed by the state or the department of corrections, *nor shall any such prisoner come within any of the provisions of the workers' compensation* provided in title 23, chapter 6 *or be entitled to any benefits thereunder* whether on behalf of himself or of any other person.

A.R.S. § 31–254(I) (emphasis added) (footnote omitted).

The City and the Fund appear to argue that this exclusion applies to the claimant simply because he remained a prisoner despite his work release status. This argument is overbroad because the exclusion also depends on whether a prisoner was compensated under A.R.S. § 31–254. Thus, the dispositive question is whether the claimant's compensation satisfied this condition.

The statutes governing ARCOR enterprises directly answer this question. Payments for prisoner labor derived from contracts between ADOC and political subdivisions, among others, are deposited in the ARCOR revolving fund. *See* former A.R.S. § 41–1624.01(C).[3] The ADOC director disburses compensation to prisoners from this fund. *See* former A.R.S. § 41–1624(A)(2).[4] This compensation, in turn, is paid "pursuant to § 31–254." A.R.S. § 41–1624.01(A).[5]

2. Section 31–254 was amended by Laws 1987, ch. 358, § 1, so that former § 31–254(I) is presently listed under § 31–254(J). We will refer to it as § 31–254(I), however, because this is what it was listed as at the time this claim arose.

3. Section 41–1624.01(C) has since been amended by Laws 1987, ch. 358, § 8.

4. Section 41–1624(A)(2) has since been amended by Laws 1987, ch. 358, § 7.

5. Section 1624.01(A) has since been amended by Laws 1987, ch. 358, § 8.

As previously noted, the written intergovernmental agreement between ARCOR and the City was authorized under section 41–1624.01(B) and required the City to pay to ARCOR a specified salary for prisoner labor. Accordingly, the claimant was being compensated under A.R.S. § 31–254. Therefore, the statutory exclusion of section 31–254(I) applied to him.

The claimant does not address these ARCOR provisions. Rather, he relies on section 31–254(A) as evidence of legislative intent to restrict section 31–254(I) to prisoners "engaged in productive work *in any state prison or institution under the jurisdiction of the department of corrections* as a part of the prison industries program...." A.R.S. § 31–254(A) (emphasis added).[6] We disagree that the statutory history supports such reliance or his interpretation.

The original 1970 version of section 31–254 included the same limitation in paragraph A. *See* Laws 1970, Ch. 112, § 3. But it also included a general provision for other prisoner labor in paragraph C:

> Prisoners not engaged in work programs under the jurisdiction of the correctional industries ..., but who are engaged in productive labor outside of such program, may be compensated in like manner....

*Id.* In 1976, the legislature deleted the quoted part of paragraph C. *See* Laws 1976, Ch. 103, § 1. In 1978, the legislature amended paragraph A to prescribe compensation for prisoners privately employed under ARCOR contract and also added paragraph A to A.R.S. § 41–1624.01. *See* Laws 1978, Ch. 164, §§ 11, 23. Finally, in 1985, the legislature adopted the language of § 31–254(A) in effect at the time this claim arose, which included both public and private employment under ARCOR contract. *See* Laws 1985, Ch. 265, § 1. In short, the operative distinction is not where or for whom a prisoner works, but whether he is compensated under section 31–254(A).

In this context, the claimant also argues that the evidence supported the administrative law judge's conclusion that the City employed the claimant. Absent a statute governing workers' compensation coverage of prisoners, entitlement depends on whether the claimant worked under a contract for hire. *See* 1C A. Larson, *Workmen's Compensation Law* §§ 47.00–47.31(f) (1986). The pre-statutory case law in Arizona divided along these factual lines. *Compare Johnson v. Industrial Comm'n,* 88 Ariz. 354, 356 P.2d 1021 (1960) (distinguishing authority from jurisdiction with statutory exclusion, supreme court concluded that prisoner entitled to compensation because facts established contract for hire) *with Watson v. Industrial Comm'n,* 100 Ariz. 327, 414 P.2d 144 (1966) (in absence of constitutional or statutory provision concerning compensation of prisoners, supreme court concluded that claimant not entitled to compensation because no contract for hire). We agree with the City and Fund that this analysis is material *only* if the statutory exclusion is inapplicable. *But cf. Kenney v. Industrial Comm'n,* 24 Ariz.App. 3, 535 P.2d 31 (1975) (denying compensation to prisoner because statutory exclusion applicable *and* contract for hire requirement unsatisfied). Because we have concluded that section 31–254(I) applies to the current case, we need not de-

---

**6.** The full text of the version of this paragraph in effect at the time this claim arose reads as follows:

> A. Each prisoner who is engaged in productive work in any state prison or institution under the jurisdiction of the department of corrections as a part of the prison industries program shall receive for his work such compensation as the director of the department of corrections shall determine. Such compensation shall be in accordance with a graduated schedule based on quantity and quality of work performed and skill required for its performance, but in no event shall such compensation exceed fifty cents per hour unless the prisoner is employed in an ARCOR enterprise pursuant to title 41, chapter 11, article 3. If the director enters into a contract pursuant to § 41–1624.01 with a private person, firm, corporation or association the compensation shall be as prescribed by the person, firm, corporation or association but shall not be below the minimum wage. Compensation shall not be paid to prisoners for attendance at educational training or treatment programs, but compensation may be paid for work training programs.

Former A.R.S. § 31–254(A) (footnote omitted).

cide whether it is more analogous to *Johnson* or to *Watson.*

Since we have found the statutory exclusion applicable, we next address the claimant's assertion that the statutory exclusion is unconstitutional. The claimant first argues that the exclusion expressed in section 31–254(I) violates the constitutional directive to the legislature to "enact a Workmen's Compensation Law applicable to workmen engaged in manual or mechanical labor in all public employment whether of the State, or any political subdivision or municipality thereof as may be defined by law and in such private employments as the Legislature may prescribe...." Ariz. Const. art. XVIII, § 8.[7] In line with this argument, claimant contends that because he performed manual labor for a political subdivision, the constitution requires compensation coverage.

■ We disagree that this constitutional directive to cover specified "public employment" applies to prisoners. When interpreting a constitutional provision, we attempt "to ascertain and give effect to the intent and purpose of the framers ... and of the people who adopted it." *McElhaney Cattle Co. v. Smith,* 132 Ariz. 286, 645 P.2d 801 (1982); *accord McPeak v. Industrial Comm'n,* 154 Ariz. 232, 741 P.2d 699 (1987). The subject provision was framed and approved in 1925. In that era, prisoners were consigned to hard labor. *See, e.g.,* Pen.Code 1913, § 1448. However, in more recent times,

> [p]rison labor has evolved from the concept of 'hard labor' as a form of punishment and an expression of repentance, to the current theory that such labor should serve a rehabilitative purpose.... The rehabilitative aspect of prison labor seeks to instill a sense of self-discipline and 'thrift' in the prisoner while providing him with marketable skills and good work habits upon release.

Note, *The Prisoner's Paradox: Forced Labor and Uncompensated Injuries,* 10 New

Eng.J. on Crim. & Civ.Confinement 123, 129 (1984) (footnotes omitted) (hereinafter Journal). Since the work performed by prisoners increasingly resembled the work performed by other workers, commentators advocated extending workers' compensation coverage to prisoners. *See id.* at 136; *accord* 1C A. Larson, *supra* § 47.31(e) (traditional rule denying compensation out of tune with modern prison conditions in which prisoners exposed to all the risks of ordinary employment and are burdened with the effects of permanent disability after release); *see also, e.g.,* Note, *A Time for Recognition: Extending Workmen's Compensation Coverage to Inmates,* 61 N.D.L.Rev. 403 (1985); Note, *Workers' Compensation for Prisoners,* 51 N.Y.U.L. Rev. 478 (1976); Note, *Granting Workmen's Compensation Benefits to Prison Inmates,* 46 S.Cal.L.Rev. 1223 (1972–73).

The legislature unquestionably has authority to extend compensation coverage to prisoners. *See Kenney v. Industrial Comm'n,* 24 Ariz.App. at 5, 535 P.2d at 33; *see also Ferrell v. Industrial Comm'n,* 79 Ariz. 278, 288 P.2d 492 (1955). We simply do not agree that the mandatory coverage for "public employment" adopted in 1925 must extend to a prisoner who happens to perform manual labor for a political subdivision.

■ The claimant next argues that the statutory exclusion deprives him of "the equal protection of the laws." U.S. Const. amend. XIV, § 1. We again disagree. We acknowledge the proposition that constitutional protections do extend to prisoners. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *accord Brown v. State,* 117 Ariz. 476, 573 P.2d 876 (1978). We also acknowledge the proposition that classifications affecting workers' compensation benefits must satisfy the rational basis standard of equal protection review. *See Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (compensation

---

7. This section is not the source of the legislative power to enact workers' compensation laws. Rather, it is a directive to the legislature to exercise its police power. *See Atkinson, Kier*

*Bros., Spicer Co. v. Industrial Comm'n,* 35 Ariz. 48, 274 P. 634 (1929); *DeSchaaf v. Industrial Comm'n,* 141 Ariz. 318, 686 P.2d 1288 (App. 1984).

scheme discriminating against unacknowledged illegitimate children had no rational relationship to a legitimate state purpose and therefore violated the equal protection guarantee); *accord Jalifi v. Industrial Comm'n*, 132 Ariz. 233, 644 P.2d 1319 (App.1982) (reduction of death benefit for nonresident alien consistent with rational relationship test).

We have not been cited to nor have we discovered any caselaw supporting the claimant's position that excluding prisoners from compensation coverage lacks a rational basis. The cases that the claimant has cited involve the interpretation of sister state compensation statutes, not the application of equal protection review to statutory exclusions. *See, e.g., Courtesy Constr. Corp. v. Derscha*, 431 So.2d 232 (Fla.App.1983); *Hamilton v. Daniel Int'l Corp.*, 273 S.C. 409, 257 S.E.2d 157 (1979).

The claimant also relies on the policy justifications for extending coverage to prisoners. As previously noted, prisoners are exposed to the same risks of injury as other workers and their disabilities may be permanent. *See* 1C A. Larson, *supra* § 47.31(e). Furthermore, extending coverage to work-related injuries may reduce recidivism. *See, e.g.,* Note, *supra* 10 Journal at 137. We agree that these justifications legitimately comprise a bases for extending workers' compensation coverage to prisoners, however, these justifications do not establish the irrationality of excluding such coverage. Equal protection does not mandate enlightened penology. Most of the commentators recognize this distinction. Larson, for example, advocates careful legislative amendment of compensation acts without suggesting that such an amendment is constitutionally required. *See* 1C A. Larson, *supra* § 47.31(f); *see also* Note, *supra*, 51 N.Y.U.L.Rev. at 484, n. 26 ("While this Note disputes the equity and rationality of such a classification, such a discrimination, in the context of equal protection analysis, seems a reasonable one for a state legislature to impose when combined with the state's penological objective of deterrence."). *But cf.* Note, *supra* S.Cal.L.Rev. at 1260–61.

We cannot say that A.R.S. § 31–254(I) lacks any rational basis. Labor remains compulsory for prisoners. *See* A.R.S. § 31–251(A). This compulsory labor serves punitive as well as rehabilitative purposes. Furthermore, there are important economic differences between prisoners and other workers. The ADOC, and ultimately the taxpayer, continues to pay for prisoner room, board, and custodial supervision even when a prisoner has been released to work. If workers' compensation coverage is extended to prisoners, the consumer of the goods or services, ultimately the same taxpayer, pays that cost as well. *See generally* 1 A. Larson, *supra* § 3.20 (1985). The legislature could rationally refuse to impose this additional burden on the taxpayer.

We accordingly conclude that the statutory exclusion of workers' compensation coverage to prisoners does not deprive them of the "equal protection of the laws." U.S. Const. amend XIV, § 1. We adhere to our previously stated conclusion that "[i]f our state is to join those ... others ... which allow some form of workmen's compensation for prisoners, it will be up to the Legislature to so provide." *Kenney v. Industrial Comm'n*, 24 Ariz.App. at 5, 535 P.2d at 33. Although there are a number of justifications which comprise a bases for extending workers' compensation coverage to prisoners, the question of whether workers' compensation coverage should be extended to prisoners is for the legislature and not the judiciary.

For the foregoing reasons, the award is set aside.

FROEB, P.J., and GRANT, J., concur.