**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM W. CASTLE,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>EUROFRESH, INC., AKA Eurofresh Farms; ARIZONA DEPARTMENT OF CORRECTIONS, an agency of the State of Arizona; DORA B. SCHRIRO, Warden, former Director, Arizona Department of Corrections; CHARLES L. RYAN, Director, Arizona Department of Corrections; STATE OF ARIZONA,<br>*Defendants-Appellees*. | No. 11-17947<br><br>D.C. No.<br>3:09-cv-08114-JWS<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
John W. Sedwick, District Judge, Presiding

Argued and Submitted
April 11, 2013—Pasadena, California

Filed September 24, 2013

Before: Marsha S. Berzon, Richard C. Tallman,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Berzon

# SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in an action brought by an Arizona state prisoner who alleged that defendants violated the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, and the Rehabilitation Act of 1973, 29 U.S.C. § 794, by failing to reasonably accommodate his disability at a prison job.

The panel held that plaintiff's claims against Eurofresh, a private company that contracted with the Arizona Correctional Industries for a convict labor force, were properly dismissed. The panel held that plaintiff was not Eurofresh's "employee" under Title I of the ADA because his labor belonged to the State of Arizona, which put him to work at Eurofresh in order to comply with its statutory obligations. The panel further held that because Eurofresh did not receive federal financial assistance, either directly or indirectly, it was not subject to the requirements of the Rehabilitation Act.

The panel reversed the judgment in favor of the State Defendants because it determined that those defendants could be held liable for acts of disability discrimination committed by Eurofresh, its contractor. The panel stated that the law was clear—State Defendants may not contract away their obligation to comply with federal discrimination law. The

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel remanded to the district court to determine in the first instance whether any such discrimination occurred.

Concurring, Judge Berzon stated that this circuit's precedent compelled the conclusion that plaintiff was not an employee under Title I of the ADA. Judge Berzon stated that the notion that prisoners who work for covered employers can never be "employees" for purposes of federal employee-protective statutes undermines those statutes as applied to employees generally and misconstrues the reach of the "employee" designation.

## COUNSEL

Candace Carroll and certified law students Sara Belvill (argued), Austin Berger, Allison Capozzoli, and Lauren Presser, University of San Diego Legal Clinics, San Diego, California, for Plaintiff-Appellant.

Jeffrey Willis and Melissa A. Marcus (argued), Snell & Wilmer L.L.P., Tuscon, Arizona, for Defendant-Appellee Eurofresh Inc.

Joseph D. Estes, Assistant Attorney General, and Katherine E. Watanabe (argued), Arizona Attorney General's Office, Phoenix, Arizona, for Defendants-Appellees State of Arizona, Arizona Department of Corrections, Dora Schriro and Charles Ryan.

## OPINION

M. SMITH, Circuit Judge:

William Castle, formerly an Arizona state prisoner,[1] appeals the district court's entry of judgment in favor of defendants Eurofresh Inc., the State of Arizona (the State), the Arizona Department of Corrections (ADC), and certain officials of the ADC.[2]  Castle alleges that the defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134, and the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794, by failing to reasonably accommodate his disability.  We conclude that Castle's claims against Eurofresh were properly dismissed.  Castle was not Eurofresh's "employee" under Title I of the ADA, and Eurofresh does not receive federal financial assistance, as it must in order to subject it to the requirements of the RA.  However, we reverse the judgment in favor of the State Defendants, because those defendants may be held liable for acts of disability discrimination committed by one of their contractors.  We therefore remand Castle's claims against the State Defendants for further proceedings required by this opinion.

## BACKGROUND

Castle was convicted of theft and perpetuating a scheme or artifice to defraud in violation of Ariz. Rev. Stat. §§ 13-

---

[1] Castle was released from prison on April 22, 2013.

[2] Throughout this opinion we refer collectively to the State, the ADC, and the individual defendants as the State Defendants.

1802, 13-2310. He was sentenced to a ten-year prison term and placed in the custody of the ADC.

Arizona law requires all able-bodied inmates in ADC's custody to "engage in hard labor for not less than forty hours per week." Ariz. Rev. Stat. § 31-251(A). Most inmates satisfy this requirement by participating in the ADC's Work Incentive Pay Program (WIPP). Inmate wages under the WIPP range from ten to fifty cents per hour, although inmates can earn raises for good performance. Some inmates, however, receive significantly more remunerative work assignments through a separate convict labor program run by Arizona Correctional Industries (ACI).[3] *See* Ariz. Rev. Stat. §§ 41-1621–1630. ACI contracts with private companies to provide them with a convict labor force. One company that contracts with ACI is Eurofresh, which describes itself as "America's largest greenhouse operation," capable of growing 200 million pounds of "hydroponic tomatoes" each year.

Castle began picking tomatoes for Eurofresh in July 2008 at a greenhouse located approximately sixty miles from the prison where he was incarcerated. The job was physically strenuous—Castle was required to be on his feet for his entire seven hour shift and often had to push a 600 pound tomato

---

[3] ACI is a statutorily created entity that operates under the "organizational auspices of the ADC," but is funded solely "through its own operations." *See* Ariz. Rev. Stat. § 41-1624. ACI describes its mission as creating "opportunities for offenders to develop marketable job skills and good work habits through enterprises that produce quality products and services for [ACI's] customers." Those customers have included firms that produce "clothing, fabricated steel, livestock, dairy products, and hotel reservations for Best Western motels." *Hale v. State of Arizona*, 993 F.2d 1387, 1390 (9th Cir. 1993) (en banc).

cart.   Toward the end of August 2008, Castle began experiencing "intolerable pain and swelling" in his left ankle after working for two or more hours at Eurofresh.  Castle had seriously injured his ankle decades earlier during a parachute accident that occurred while Castle attended the United States Army Airborne School.[4]

Because of his pain, Castle asked a Eurofresh supervisor if he could take short breaks during the work day to rest his ankle.  According to Castle, the supervisor indicated that Castle would be fired if he insisted on taking breaks.  Castle continued working at Eurofresh, but sought medical treatment for his injury from the ADC.  One of Castle's medical providers suggested that he ask for a job change or accommodation.

In October 2008, Castle sent certified letters to both ACI and Eurofresh informing them that he could not walk or stand for long periods without experiencing extreme pain.  He asked to be provided with a position at Eurofresh "that does not require walking for long periods of time, as well as pushing heavy carts."  Castle later met with representatives of both Eurofresh and ACI to discuss his disability.  He again suggested that he be reassigned to a different job, such as operating box or label machinery in the "pack house."  A Eurofresh manager responded that there were no other positions available to inmate laborers,[5] but that Eurofresh and

---

[4] The Department of Veterans Affairs has assigned Castle a 20 percent service-connected disability rating as a result of the accident.

[5] Defendants claim that Castle could not be reassigned to another job, such as a job in the pack house, because civilian workers were employed in those positions, and "the inmate-to-security personnel ratio was not

ACI would take Castle's request "under advisement." Castle claims that he was later informed that no accommodation would be made, and that his only option was to quit his position at Eurofresh. Defendants claim that Eurofresh offered to promote Castle to a "de-leafer" position,[6] but that Castle refused the offer. No party disputes, however, that the ADC eventually reassigned Castle to a WIPP job in the prison motor pool. Castle's new job paid 50 cents per hour. Castle had been receiving more than $2.25 per hour picking tomatoes at Eurofresh.

After pursuing a grievance with the ADC, Castle filed a discrimination claim with the Equal Employment Opportunity Commission (EEOC). After the EEOC issued Castle a Notice of Suit Rights letter, Castle brought suit against Eurofresh and the State Defendants.

In his initial complaint, Castle alleged that Eurofresh and the State Defendants violated his rights under Titles I and II of the ADA, Section 504 of the RA, and the Arizona Civil Rights Act, by failing to reasonably accommodate his disability. Castle also claimed that Eurofresh had breached its contractual obligations with the State, which required that Eurofresh comply with all applicable federal and state

---

adequate" to have inmates work alongside non-convict laborers. Castle disputes this claim, and contends that inmates regularly worked among Eurofresh's civilian employees in the pack house and elsewhere.

[6] Defendants acknowledge that the de-leafer position also requires walking and standing, but claim the job is less physically taxing than picking tomatoes because the carts used for the de-leafing job are lighter than those used by the tomato pickers.

employment laws.[7]  Castle sought money damages but did not request reinstatement at Eurofresh.

The district court dismissed Castle's Title I claim against Eurofresh with prejudice.  The court found that Castle lacked standing to sue under the ADA because, as a prisoner, he did not have an employment relationship with Eurofresh.  The district court also dismissed Castle's RA claim against Eurofresh, reasoning that Castle had not adequately alleged that Eurofresh is the direct or indirect recipient of federal financial assistance.  Castle was given leave to amend his RA claim against Eurofresh.

In the same order, the district court also dismissed Castle's ADA and RA claims against the State Defendants. The court concluded that Castle could not state a claim under either statute because "plaintiff's own evidence shows that he was given a different work assignment [in the motor pool]—one that does not require prolonged standing and walking."  Castle was granted leave to amend his complaint against the State Defendants.

After Castle twice amended his complaint, Eurofresh and the State Defendants filed motions seeking dismissal of Castle's remaining claims.   The district court granted Eurofresh's motion with prejudice, again concluding that Castle failed to adequately allege that Eurofresh received federal financial assistance.  The district court denied the State Defendants' motion, however, and ordered them to answer Castle's allegations that they violated Title II of the ADA and Section 504 of the RA.

---

[7] Castle only appeals the district court's determinations regarding his ADA and RA claims.

The State Defendants filed their answer in October 2010. In June 2011, the State Defendants filed a motion for summary judgment on Castle's remaining claims against them. The district court granted the motion in November 2011. The court reasoned that the State Defendants did not violate either the ADA or the RA because: (1) the State Defendants lacked the power to reassign or otherwise accommodate Castle within Eurofresh; and (2) the State Defendants had accommodated Castle by reassigning him to a job in the prison motor pool. Castle timely appealed.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction to review the district court's entry of judgment under 28 U.S.C. § 1291. We review an order granting a motion to dismiss de novo. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). "All well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted). However, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Faulkner*, 706 F. 3d at 1019 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

We similarly review a grant of summary judgment de novo. *Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir. 2013). We "must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district

court correctly applied the relevant substantive law." *Id.* (quoting *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)).

## DISCUSSION

### I. Castle's ADA Claim Against Eurofresh

Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . [the] privileges of *employment*." 42 U.S.C. § 12112(a) (emphasis added). Thus the first question we must resolve is whether Castle, an inmate required to work under Arizona law, had an employment relationship with Eurofresh within the meaning of the ADA.

The ADA defines an "employee" as "an individual employed by an employer." 42 U.S.C. § 12111(4). All parties agree that Eurofresh is an "employer" under the ADA.[8] But the parties vigorously dispute whether Castle was "employed" by Eurofresh. While this specific issue appears to be one of first impression under the ADA, we do not write on a wholly blank slate: we, as well as a number of our sister circuits, have previously considered whether prisoners should be treated as "employees" under various other federal statutes.[9]

---

[8] *See* 42 U.S.C. § 12111(5)(A).

[9] *See, e.g.*, *Hale*, 993 F.2d at 1395 (prisoner is not an employee under the Fair Labor Standards Act (FLSA)); *Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994) (same); *Alexander v. Sara, Inc.*, 721 F.2d 149, 150 (5th Cir. 1983) (per curiam) (same); *Coupar v. Dep't of Labor*, 105 F.3d 1263, 1267 (9th Cir. 1997) (prisoner not an employee within the meaning of the whistleblower provisions of the Clean Air Act and the

The leading case in our circuit is our en banc decision in *Hale*, 993 F.2d 1387. There, we addressed whether certain Arizona state prisoners were "employees" within the meaning of the FLSA. *Id.* at 1389–90. Like the plaintiff in this case, the appellants in *Hale* participated in labor programs administered by ACI for the purpose of implementing Arizona's requirement that all able-bodied prisoners perform hard labor.[10] *Id.* We concluded that the appellants were not "'employees' of the prison entitled to be paid a minimum wage under the FLSA." *Id.* at 1395.

In reaching our holding in *Hale*, we first acknowledged the "general rule" that we must consider the "economic reality" of a labor relationship when determining whether it is an employment relationship under federal law. *Id.* at 1393–94. In this circuit, we typically evaluate the "economic reality" of a labor relationship by considering the factors laid out in *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983).[11] In *Hale*, however, we determined that the *Bonnette* factors "are not a useful

---

Toxic Substances Control Act); *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (prisoner not an employee under Title VII or the Age Discrimination in Employment Act). *But see Baker v. McNeil Island Corr. Ctr.*, 859 F.2d 124, 128 (9th Cir. 1988) (prisoner potentially an employee under Title VII); *Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 14 (2d Cir. 1984) (prisoner may be an employee under FLSA).

[10] The appellants in *Hale* worked for ARCOR Enterprises, ACI's predecessor entity. *See Hale*, 993 F.3d at 1389.

[11] Those factors include "whether the alleged employer has the power to hire and fire the employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." *Hale*, 993 F.3d at 1394 (citing *Bonnette*, 704 F.2d at 1470).

framework in the case of prisoners who work for a prison-structured program because they have to." *Hale*, 993 F.2d at 1394; *see also Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992) (noting that the *Bonnette* factors are useful where "it is clear that some entity is an 'employer' and the question is which one," but not where the question is more basic: can prisoners "plausibly be said to be 'employed' in the relevant sense at all"). We concluded that "[r]egardless of how the *Bonnette* factors balance . . . the economic reality of the relationship between the worker and the entity for which work was performed lies in the relationship between prison and prisoner. It is penological, not pecuniary." *Hale*, 993 F.2d at 1394–95; *see also Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1331 (9th Cir. 1991) (Rymer, J. concurring) (reasoning that "inmate labor belongs to the institution").

A few years after *Hale*, in *Coupar v. Department of Labor*, 105 F.3d 1263 (9th Cir. 1997), we once again had the opportunity to consider a prisoner's employment status under federal law. Douglas Coupar was a federal inmate obligated to work as a condition of his sentence. *Id.* at 1264. Coupar filed environmental complaints against the government corporation where he worked, claiming that he subsequently faced discrimination in violation of the whistleblower provisions of the Clean Air Act and the Toxic Substances

Control Act.**[12]**  *Id.*  We found that Coupar was not protected by either statute.  *Id.*

Coupar relied on *Baker v. McNeil Island Corrections Center*, 859 F.2d 124 (9th Cir. 1988), to argue that he was an employee for the purposes of obtaining whistleblower protection.  *Coupar*, 105 F.3d at 1266.  In *Baker*, we left open the possibility that a prisoner could state a claim for employment discrimination under Title VII, and remanded to the district court for further findings regarding the precise labor relationship between the plaintiff and his jailors.  *See Baker*, 859 F.2d at 128 (holding that it was not "beyond doubt that no set of facts could be proven to entitle Baker to relief").  The plaintiff in *Baker*, however, had not alleged that the position he sought was "one that fulfilled a prison work requirement."  *Coupar*, 105 F.3d at 1266.  Coupar, on the other hand, *was* obligated to work—just like the plaintiffs in *Hale*.  We found this to be the crucial fact that "differentiate[d] *Baker* from Coupar's case."  *Id.* Consequently, we held that where an inmate is obligated to work at some job pursuant to a prison work program, "[t]hat fact [alone] brings him within the rule of *Hale*."  *Id.* at 1265.

Like the plaintiff in *Coupar*, Castle cites *Baker* for the proposition that he should be treated as Eurofresh's employee under the ADA.  But as we did with the plaintiff in *Coupar*, we must reject Castle's claim: Castle "was obligated to work

---

**[12]** Those provisions state that "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to . . . compensation, terms, conditions, or privileges of employment" because the employee engages in protected activities related to the enforcement of the Acts.  15 U.S.C. § 2622(a) (Toxic Substances Control Act); 42 U.S.C. § 7622(a) (Clean Air Act).

at some job pursuant to a prison work program," *id.*, and this fact alone brings Castle's claims within the rule of *Hale*.[13] *Baker* is inapposite.

We are equally unpersuaded by Castle's other attempts to distinguish this case from *Hale* and *Coupar*.  For example, Castle notes that he worked for a private corporation, while the plaintiffs in *Hale* and *Coupar* toiled for government-controlled entities.  Castle further argues that one of the supporting rationales for the *Hale* decision is not present here, because the purpose of the ADA is different than that of the FLSA.[14]  While these distinctions have some substance, they are ultimately irrelevant.  *Coupar* identifies *one* factor that triggers application of the *Hale* rule—an inmate's legal obligation to work.  That factor is indisputably present in this case.  The absence of other elements, therefore, has no bearing on Castle's standing under the ADA.  Castle is not Eurofresh's employee under the ADA because his labor belongs to the State of Arizona, which put him to work at Eurofresh in order to comply with its statutory obligations. *See Hale*, 993 F.2d at 1395; *Coupar*, 105 F.3d at 1267.

---

[13] Castle argues that he did not "work for a prison-structured program because he had to," and notes that he had a choice whether or not to work for Eurofresh.  This argument misses the mark. While Castle did not have to work for Eurofresh specifically, he was nevertheless obligated to work for some prison-structured labor program.  *See* Ariz. Rev. Stat. § 31-251(A).  In any event, we rejected the same argument in *Coupar*.  *See Coupar*, 105 F.3d at 1265. ("Although Coupar did not have to work for FPI in particular, as an inmate he was obligated to work at some job pursuant to a prison work program.").

[14] In *Hale*, we noted that the primary concern of the FLSA—ensuring laborers' minimum standards of living—"does not apply to prisoners, for whom clothing, shelter, and food are provided by the prison."  *Hale*, 993 F.2d at 1396.

## II.  Castle's RA Claim Against Eurofresh

"The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance . . . ." *Armstrong v. Davis*, 275 F.3d 849, 862 n.17 (9th Cir. 2001) (internal quotations omitted), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005); *see also Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 999 (9th Cir. 2013). The district court dismissed Castle's RA claim against Eurofresh because it concluded that Castle could not plausibly allege that Eurofresh received federal financial assistance, either directly or indirectly.  We find no error in the district court's conclusion.

In *United States Department of Transportation v. Paralyzed Veterans of America*, the Supreme Court held that Congress intended to strictly limit the scope of the RA solely "to those who actually 'receive' federal financial assistance." 477 U.S. 597, 605 (1986), *superseded by statute on other grounds*, Air Carrier Access Act of 1986, Pub. L. No. 99-435 (1986).  The Court explained that "[b]y limiting coverage to *recipients*, Congress imposes the obligations of § 504 upon those who *are in a position to accept or reject those obligations* as a part of the decision whether or not to 'receive' federal funds."  *Id.* at 606 (emphases added); *see also Greater L.A. Council on Deafness, Inc., v. Zolin*, 812 F.2d 1103, 1111 (9th Cir. 1987) (recognizing that the RA "does not prohibit discrimination against the handicapped as such; it simply bars the use of federal funds to support programs or activities that so discriminate").  Consequently, while those who affirmatively choose to receive federal aid may be held liable under the RA, liability will "not extend as far as those who benefit from it," because application of

§ 504 to all who benefit economically from federal assistance would yield almost "limitless coverage." *Paralyzed Veterans*, 477 U.S. at 607–08.

Castle argues that Eurofresh is the indirect recipient of federal financial assistance. Specifically, Castle contends that ACI is a direct recipient of federal financial assistance, and that Eurofresh indirectly receives federal financial assistance through its contract with ACI, which provides that ACI, and not Eurofresh, will pay Social Security and Medicare taxes on the wages of Eurofresh's prison laborers. These allegations are insufficient to survive a motion to dismiss.

First, it is unclear what connection, if any, exists between ACI's receipt of federal funds and its decision to assume responsibility for the federal tax liabilities related to Eurofresh's use of prison laborers. But even if such a connection exists, it is not enough to establish Eurofresh's liability under the RA. To state a claim, Castle must do more than simply show that Eurofresh benefits from federal monies—he must show that Eurofresh has affirmatively chosen to "provid[e] employment for the handicapped as a *quid pro quo* for the receipt of federal funds." *Id.* at 605; *see also Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999). This Castle has not done. Indeed, Castle has presented no evidence that Eurofresh affirmatively chose to receive federal monies, and in so doing accepted the concomitant responsibilities of complying with certain federal mandates, such as those contained in the RA. *See Paralyzed Veterans*, 477 U.S. at 605 (placing substantial emphasis on the "contractual nature of the receipt of federal moneys"). Nor has Castle plausibly alleged that Eurofresh is the intended recipient of federal funds, and that ACI is a "mere conduit[] of the aid to its intended recipient[]." *Id.* at

607.  Because Castle has not alleged facts which plausibly demonstrate that Eurofresh receives federal financial assistance, Castle's RA claim against Eurofresh was properly dismissed.

## III.     Castle's ADA and RA Claims Against the State Defendants

We next consider the potential liability of the State Defendants.  The State Defendants may be liable under Title II of the ADA even though Eurofresh may not be sued under Title I.  *See, e.g.*, *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 883–84 (9th Cir. 2004) (noting that plaintiffs often sue multiple defendants under separate titles of the ADA); *Johnson v. City of Saline*, 151 F.3d 564, 571–72 (6th Cir. 1998) ("Even though the [private] businesses may be subject to Title III of the ADA . . . the city is simultaneously subject to Title II because it is a landlord."). Moreover, unlike Eurofresh, the State Defendants cannot plausibly deny that they receive federal financial assistance, and thus they are obligated to comply with the RA.

The State Defendants concede, as they must, that Title II applies to the operation of state prisons.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates.").  Consequently, State Defendants must ensure that disabled prisoners are not discriminated against with regard to the provision of "the benefits of [their] services, programs, or activities" on account of a prisoner's disability.  42 U.S.C. § 12132; *see also Yeskey*, 524 U.S. at 210 (finding that prison vocational programs are "benefits" of a public entity). Nevertheless, the State Defendants contend that Title II does not apply in this case, because "[the State Defendants] had no

authority to determine which jobs or job duties were available to inmates at Eurofresh, nor could they overturn [Eurofresh's] decision to refuse a request for a job modification." The State Defendants are mistaken.

In *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065–67 (9th Cir. 2010), we rejected the State of California's argument that it could not be held liable for ADA violations committed by county jails that were housing state prisoners pursuant to contracts with the state. We found it wholly irrelevant that the ADA violations occurred at county jails, rather than at state prisons under California's immediate control. Rather, we clarified that Title II's obligations apply to public entities regardless of how those entities chose to provide or operate their programs and benefits. *See id.* at 1065 ("[A] public entity, in providing any aid, benefit, or service, may not, directly *or through contractual, licensing, or other arrangements*, discriminate against individuals with disabilities." (quoting 28 C.F.R. § 35.130(b)(1)) (emphasis added)).

The State Defendants admit that ACI contracts with Eurofresh to provide "benefits" to state inmates, including paid labor and vocational training. The State Defendants are free to enter into such contracts, and likely reap numerous benefits from such arrangements. But one benefit State Defendants may not harvest is immunity for ADA violations: State Defendants are obligated to ensure that Eurofresh—like all other State contractors—complies with federal laws prohibiting discrimination on the basis of disability.[15] *See*

---

[15] We note with interest that while State Defendants disclaim this obligation on appeal, ACI's contract with Eurofresh explicitly requires Eurofresh to comply with all federal and state employment laws, including

*Armstrong*, 622 F.3d at 1065–67; *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003) ("All governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by [T]itle II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with [T]itle II's requirements.") (citation omitted)). The same principle applies to RA violations committed by contractors. *Henrietta D.*, 331 F.3d at 286 (holding that a state is "liable to guarantee that those it delegates to carry out its programs satisfy the terms of its promised performance, including compliance with the Rehabilitation Act"). The law is clear—the State Defendants may not contract away their obligation to comply with federal discrimination laws.

Nevertheless, we cannot determine on this record whether a violation actually occurred in this case. Federal law requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Determining whether a modification is reasonable (or even required) is necessarily a fact-specific inquiry, requiring "analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's

the ADA. In district court, Castle alleged that ACI breached its contract for failing to comply with such statutes. The court dismissed this claim, reasoning that Castle had not alleged elements necessary to establish himself as a third-party beneficiary. Castle does not object to that dismissal on appeal and we express no opinion on the matter.

standards." *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999). Specifically in the prison context, we have held that a district court may consider "with deference to the expert views of facility administrators, a detention or correctional facility's legitimate interests (namely, in maintaining security and order and operating an institution in a manageable fashion) when determining whether a given accommodation is reasonable." *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008) (citations and internal quotation marks omitted).

Likely because the district court erroneously concluded that the State Defendants are not liable under either Title II or the RA, the court made insufficient findings regarding whether a reasonable modification was made. Instead, the district court simply concluded without analysis that Castle's reassignment to a different job in the WIPP program was reasonable. While that may ultimately be correct, where the district court makes no findings regarding the reasonableness of a proposed modification or accommodation, we must remand to the district court to perform the necessary analysis. *See McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (citing *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996)).

## CONCLUSION

Castle's claims against Eurofresh were properly dismissed because Castle and Eurofresh were not in an employment relationship, and Eurofresh does not receive federal financial assistance. However, judgment was improperly granted to the State Defendants. The State Defendants are liable for disability discrimination committed by a contractor. We

consequently remand to the district court to determine in the first instance whether such discrimination occurred.

Each party shall be responsible for its own costs on appeal. Fed. R. App. P. 39(a)(4).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

BERZON, Circuit Judge, concurring:

I concur in Part II and Part III of the majority opinion, and also, reluctantly, in Part I.

Part I holds Castle not an employee under Title I of the Americans with Disabilities Act ("ADA"). 42 U.S.C. §§ 12111(4), 12112(a). The sweep of *Hale v. Arizona*, 993 F.2d 1387 (9th Cir. 1993), and *Coupar v. Department of Labor*, 105 F.3d 1263 (9th Cir. 1997), compels that conclusion. But the notion that prisoners who work for covered employers can never be "employees" for purposes of federal employee-protective statutes undermines those statutes as applied to employees generally and misconstrues the reach of the "employee" designation.

Castle labored for a private employer, off prison grounds, under compulsion of a sentence requiring work. *Hale*, by contrast, concerned prison labor that shared only the latter two of these three characteristics, and so did not expressly decide the employee status of prisoners working on behalf of private employers. *Hale*, 993 F.2d at 1390. That distinction, I would like to think, matters: A profit-seeking firm that

hires convicts at its own worksite should not be shielded from the costs of compliance with the ADA. Those costs can be substantial, as the ADA requires employers to make "reasonable accommodation," allowing disabled employees to complete a job's "essential functions," 42 U.S.C. §§ 12111(8), 12112(a), unless such accommodation "would impose an undue hardship" on the employer's business, 42 U.S.C. §§ 12112(b)(5)(A). Permitting private employers to escape those costs while profiting from the use of prison labor markets undermines the enforcement of the statutory requirements generally, by creating incentives for competing employers to shirk compliance with regard to non-prison labor—and thereby economically disadvantaging competitors of those employers using prison labor.

Precedent, however, forecloses consideration of such concerns when deciding whether prison laborers are covered by federal statutes protecting employees. *Hale* proclaimed broadly that the usual standard for evaluating employee status—the economic reality test described by *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)—is inapplicable "in the case of prisoners who work for a prison-structured [labor] program because they have to." *Hale*, 993 F.2d at 1394. In that circumstance, we held, "the economic reality of the relationship between the worker and the entity for which work was performed lies in the relationship between prison and prisoner. It is penological, not pecuniary." *Id.* at 1395. In other words, "the economic reality is that [prisoner] labor belong[s] to the institution." *Id.*

*Hale* recognized the problem of unfair competition through the use of prison labor. But it viewed the Ashurst-Sumners Act, 18 U.S.C. §§ 1761–1762, as Congress' entire

response to the adverse effects of "unfair competition in the products market from prison-made goods." *Hale*, 993 F.2d at 1397. That Act criminalizes the distribution of prisoner-made products in interstate commerce, 18 U.S.C. § 1761(a), with exceptions for certain classes of goods, 18 U.S.C. § 1761(b)–(c), including agricultural commodities, 18 U.S.C. § 1761(b). But it does not reimburse firms not employing prison labor, or the workers at such firms, for the bottom-line impact (through intrastate sales and services or sales and services of excepted products) of the cost-savings achieved by ignoring federal employee protection for prison laborers. Mandatory labor may be "penological, not pecuniary," for prisoners and their jailers. *Hale*, 993 F.2d at 1395. But it is assuredly a matter of dollars and cents to firms seeking profit in a competitive market and law-abiding citizens vying to work for them.

*Hale*'s broad language is all the more disturbing because that case concerned prisoner wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, not the ADA. The FLSA regulates matters that are, on their face, pecuniary. *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1154 (9th Cir. 2000) ("[T]he Supreme Court and the Ninth Circuit have consistently found that the central purpose of the FLSA is to enact minimum wage and maximum hour provisions designed to protect employees."). The ADA, by contrast, prohibits discrimination, with an eye toward the "*conditions* . . . of employment," 42 U.S.C. § 12112(a) (emphasis added). "[T]he mere fact of discrimination offends the dignitary interest that the statute[ is] designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs." *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 724 (8th Cir. 2003). The non-pecuniary character of prison labor thus tells us little about the

applicability of the ADA, which addresses non-economic harms.    Indeed, habituating prisoners to the sort of discrimination that Congress has outlawed elsewhere in the economy hardly rehabilitates them to our national norms or prepares them to participate in the workforce once released. *See Hale*, 993 F.2d at 1398 (listing rehabilitative goals of hard labor); *City of S. Tuscon v. Indus. Comm'n of Ariz.*, 753 P.2d 1199, 1205 (Ariz. Ct. App. 1988) (same).

Yet our primary case interpreting *Hale* rejects this commonsense distinction between *purely* economic employee protections and protections with a dignitary aspect. *Coupar* applied *Hale* to a prisoner seeking the protection of the anti-retaliation provisions of the Clean Air Act, 42 U.S.C. § 7622(a), and the Toxic Substances Control Act, 15 U.S.C. § 2622(a), notwithstanding the non-pecuniary policies that animate those Acts. *See Coupar*, 105 F.3d at 1265. It reasoned that Congress "extend[ed] whistleblower protection only to 'employees,'" and not "retaliation by *any* violator against *any* whistleblower." *Id.* at 1266 (emphasis in original). A prisoner "obligated to work at some job pursuant to a prison work program" falls "within the rule of *Hale*," no matter the policies the statute addresses, when that statute applies to "employees." *Id.* at 1265.

Like the whistleblower protections in *Coupar*, the protections of the ADA's Title I run only to "employees." 42 U.S.C. §§ 12111(4), 12112(a). Given *Coupar*'s gloss on *Hale*, I cannot avoid the conclusion that Castle is not an "employee." Consequently, although I would support reconsideration of *Hale*, or at least of *Coupar*'s reading of *Hale*, I concur in the majority's application of those cases to this one.

As today's opinion demonstrates, however, Castle—and the commonsense congressional policies he seeks to vindicate—is not without recourse. Because his jailers cannot contract away their obligations under Title II of the ADA, the majority holds them liable for any violation of Castle's right to accommodation under the ADA. *See* Maj. Op. Part III. To the extent the state passes along any such liability—and the costs of avoiding it in the future by accommodating disabled employees—to the private employers with whom it contracts, today's holding will also dampen the competitive advantages of hiring convict labor.

Other anti-discrimination statutes might be amenable to a similar solution to the problem our cases have created. Many violations of Title VII, for example, may be actionable against the prison authorities under 42 U.S.C. § 1983. *Cf. Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991) (observing that a federal prisoner may be able to bring a *Bivens* action if prison officials "discriminate against him on the basis of his age, race, or handicap, in choosing whether to assign him a job or in choosing what job to assign him").

This observation, along with the majority's Title II holding, somewhat reduces my concern about the adverse consequences of today's rulings—but only if the prison's ADA responsibilities are fully met. To meet their ADA Title II obligations, prison officials cannot simply provide *some* job to disabled prisoners, at whatever rate of pay and whatever working conditions. Rather, Title II requires "that persons with disabilities have the opportunity to receive the same benefits as non-disabled" people who are similarly situated, *Castellano v. City of New York*, 142 F.3d 58, 70 (2d Cir. 1998), so long as such opportunity can be provided via "'reasonable modifications' that would not fundamentally

alter the nature of the service provided," *Tennessee v. Lane*, 541 U.S. 509, 532 (2004).  That means, to me, that, if the prison is going to farm out prison labor to offsite private employers, at higher pay and a more favorable location than are available to prisoners within the prison's walls, the prison must ensure that the ADA standards are met with regard to *that* opportunity.

With those observations, I concur in the opinion.