# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2015

No. 14-50037

Lyle W. Cayce
Clerk

DONNIKA IVY; BERNARDO GONZALEZ; TYLER DAVIS, as next friend of
Juana Doe, a minor; ERASMO GONZALEZ; ARTHUR PROSPER, IV,

> Plaintiffs - Appellees

v.

COMMISSIONER MICHAEL WILLIAMS, in his official capacity as head of
the Texas Education Agency,

> Defendant - Appellant

---

Appeals from the United States District Court
for the Western District of Texas

---

Before JOLLY, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiffs-appellees Donnika Ivy ("Ivy") and the other named plaintiffs
(collectively, the "named plaintiffs") are deaf individuals who brought a
putative class action against defendant-appellant Michael Williams in his
official capacity as head of the Texas Education Agency (the "TEA"). They
request injunctive and declaratory relief requiring the TEA to bring driver
education into compliance with the Americans with Disabilities Act ("ADA")
and Rehabilitation Act. The district court denied the TEA's motion to dismiss
but certified its order for immediate appeal under 28 U.S.C. § 1292(b). We

No. 14-50037

granted leave for the TEA to file an appeal, and we now REVERSE and RENDER judgment dismissing the case.

## FACTS AND PROCEEDINGS

In Texas, individuals under the age of 25 cannot obtain driver's licenses unless they submit a driver education certificate to the Department of Public Safety ("DPS"). Tex. Transp. Code Ann. § 521.1601.[1]  Driver education certificates, in turn, are only available from private driver education schools licensed by the TEA. Tex. Educ. Code Ann. § 1001.101(a).[2]  The named plaintiffs are all deaf individuals who contacted a variety of TEA-licensed

---

[1] We note that § 521.1601 contains an error. The currently-effective version refers to Texas Education Code § 1001.101(a)(1) and (a)(2), even though there are not two subparts in the currently-effective version of § 1001.101(a). This problem was produced by the 2013 amendment to the Texas Education Code, which eliminated subsections (1) and (2) from § 1001.101. *Compare* Act of June 14, 2013, 2013 Tex. Sess. Law Serv. Ch. 716, § 1 (H.B. 3483), *with* Act of June 19, 2009, 2009 Tex. Sess. Law Serv. Ch. 1413, § 1 (S.B. 1317).

The parties do not mention this error in the statute, however. We assume without deciding that the parties are correct that the overall effect of the statute is that individuals 18 years of age or older can take the driver education class for adults that is provided for in Texas Education Code § 1001.1015, even though § 1001.1015 is not mentioned in the currently-effective version of Texas Transportation Code § 521.1601.

[2] There are two exceptions that allow certain young adults to obtain driver education certificates through sources other than private driver education schools. *See* Tex. Transp. Code Ann. § 521.1601. First, individuals may receive driver education certificates by taking a class taught by a parent or another specified close relative. *Id.* § 521.205. All parties assume that the parent-taught course is available only for individuals who are under 18 years old, but the statute itself does not appear to limit parent-taught courses to those under 18. *See id.* § 521.1601 (stating that those under 25 years of age must: (1) take a parent-taught class, public driver education class, or private minor driver education class, or (2), if they are over 18 years old, take a private minor or adult driver education class). We assume without deciding that the parent-taught class is not available to those who are over 18 years old. If that is the case, parent-taught classes are not an option for any of the named plaintiffs because the only named plaintiff who was under 18 when the lawsuit was filed did not have a parent or other specified relative who could offer the parent-taught class.

Second, individuals can obtain driver education certificates from driver education classes offered at public schools. Tex. Educ. Code Ann. § 29.902. It is unclear whether any of the named plaintiffs are public school students who can receive driver education certificates through these public school programs. But the TEA has not argued that the named plaintiffs had this public school option available. We assume without deciding that it was unavailable to the named plaintiffs.

2

private driver education schools, all of which informed the named plaintiffs that the schools would not accommodate them.[3]  Because they cannot obtain driver education certificates, the named plaintiffs cannot obtain driver's licenses.

A Deafness Resource Specialist with the Texas Department of Assistive and Rehabilitative Services informed the TEA of the inability of deaf individuals like the named plaintiffs to receive driver education certificates. But the TEA declined to intervene, stating that it was not required to enforce the ADA and that it would not act against the private driver education schools unless the United States Department of Justice ("DOJ") found that the schools had violated the ADA.  The Deafness Resource Specialist filed a complaint against the TEA with the DOJ, which the DOJ apparently dismissed.

Ivy filed a lawsuit in federal district court against the TEA and a private driver education school, requesting injunctive and declaratory relief against both parties under the ADA.  She later dismissed the private driver education school from the lawsuit.  After some additional procedural steps that are not relevant here, the lawsuit became a putative class action with multiple named plaintiffs and the TEA as the sole remaining defendant.  The live pleading, the Fourth Amended Complaint, requests injunctive and declaratory relief requiring the TEA to bring driver education into compliance with the ADA. The TEA filed a motion to dismiss for want of jurisdiction and for failure to state a claim.  The district court denied these motions, certified its order for interlocutory appeal, and stayed the case.  We granted the TEA leave to file an interlocutory appeal.

---

[3] At least one of the named plaintiffs has only a limited ability to read English, so a written driver education course would not be feasible.

No. 14-50037

## STANDARD OF REVIEW

We review de novo the denial of a motion to dismiss for want of jurisdiction and for failure to state a claim. *Young v. Hosemann*, 598 F.3d 184, 187–88 (5th Cir. 2010).

## DISCUSSION

We first consider the TEA's argument that the named plaintiffs lack standing to bring their claims. Finding that they have standing, we next consider whether they adequately state a claim upon which relief can be granted. We conclude that they do not, so we dismiss the case.

### A. Standing

There are three requirements for standing: (1) the plaintiff must have suffered an "injury in fact," (2) there must be "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party before the court," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and alterations omitted).

Here, the injury alleged is quite obvious—the named plaintiffs' inability to receive driver education certificates, which in turn prevents them from receiving driver's licenses. The TEA challenges the named plaintiffs' standing under the second and third prongs. The TEA argues that there is no causal connection between the named plaintiffs' injury and the TEA's conduct because it is the driver education schools, not the TEA, that refuse to accommodate the named plaintiffs. This contention is meritless. While driver education schools' actions are one cause of the injury, it is equally clear that the named plaintiffs' alleged injuries are also "fairly traceable" to the TEA's failure to inform private

4

No. 14-50037

driver education schools of their ADA obligations and its failure to deny licenses to driver education schools that violate the ADA.[4]

The TEA next argues that a court order could not redress the plaintiffs' alleged injuries. It advances three main arguments in support of this contention. First, it argues that it does not have the statutory authority under Texas law to ensure private driver education schools' compliance with the ADA. We disagree; multiple provisions of Texas law empower the TEA to perform actions that would likely redress the named plaintiffs' injuries. For example, the TEA can issue a license to a driver education school only if the school "complies with all county, municipal, state, and federal regulations, including fire, building, and sanitation codes and assumed name registration." Tex. Educ. Code Ann. § 1001.204(7). Thus, the TEA has the power to withhold licenses from driver education schools that fail to comply with the DOJ's ADA regulations.[5] Further, Texas law provides that the TEA "has jurisdiction over and control of" driver education schools and is allowed to "adopt and enforce rules necessary to administer" the chapter on driver education. Tex. Educ. Code Ann. §§ 1001.051; 1001.053(a)(3). These provisions give the TEA the power to enact regulations relating to ADA compliance in driver education schools.

---

[4] It is a separate question whether the TEA was legally required to perform these actions. That question goes to the merits of the case, not standing.

[5] The TEA argues that the meaning of "all county, municipal, state, and federal regulations" is limited by the specification that these regulations "includ[e] fire, building, and sanitation codes and assumed name registration." *See id.* § 1001.204(7). We disagree. Under Texas law, "including" is defined as a "term[ ] of enlargement and not of limitation or exclusive enumeration," and its use "does not create a presumption that components not expressed are excluded." Tex. Gov't Code Ann. § 311.005(13). Hence, the list following the word "including" does not limit the plain meaning of the phrase "all . . . federal regulations," a term that clearly encompasses the DOJ's ADA regulations.

Second, the TEA argues that a federal court cannot order it to ensure that driver education schools comply with the ADA because the court would effectively be commandeering the state into implementing a federal program. This argument misses the mark. While the federal government cannot require states to implement a federal program, the federal government *can* require the states to comply with federal law. *Reno v. Condon*, 528 U.S. 141, 150-51 (2000). The named plaintiffs are arguing that driver education schools are a "service, program, or activity" of the TEA. If they are correct, requiring the TEA to comply with the ADA in providing driver education would only require the state itself to comply with federal law, so the anti-commandeering doctrine would not be implicated.

Third, the TEA argues that withholding or revoking licenses from driver education schools would only shut down schools, not improve their compliance with the ADA. Similarly, the TEA argues that any potential fines would not necessarily change the schools' behavior. But it seems highly unlikely that all driver education schools would choose to shut their doors or accept fines rather than comply with the ADA. Instead, it is likely that the TEA's action would help redress the named plaintiffs' injuries. Thus, the redressability requirement for standing is satisfied.

## B. Failure to State a Claim

The named plaintiffs' lawsuit fails on the merits, however. They sued under both the Rehabilitation Act and Title II of the ADA. It is uncontested that the TEA receives federal funding, which is a prerequisite for Rehabilitation Act coverage. *See* 29 U.S.C. § 794(a), (b)(1)(A). Besides this special prerequisite for the Rehabilitation Act, the ADA and Rehabilitation Act "are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam). Further, "[t]he parties have not pointed to any reason why Title

II and [the Rehabilitation Act] should be interpreted differently." *Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011) (en banc). Thus, "[a]lthough we focus primarily on Title II, our analysis is informed by the Rehabilitation Act, and our holding applies to both statutes." *Id.*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It is uncontested that the TEA is a public entity and that the named plaintiffs are qualified individuals with disabilities. The key question is whether the named plaintiffs have been "excluded from participation in or . . . denied the benefits of the services, programs, or activities of [the TEA]." *Id.* To answer that question, we must decide whether driver education is a service, program, or activity of the TEA. We hold that it is not, although this is a close question for which the statutes, regulations, and case law provide little concrete guidance.

Starting with the plain text of Title II of the ADA, the phrase "services, programs, or activities of a public entity" is undefined. The Supreme Court has interpreted the phrase with reference to what "services, programs, or activities" are *provided* by the public entity. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that prisons have "programs, services, or activities" because they "provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs'"). Here, the TEA itself does not teach driver education, contract with driver education schools, or issue driver education certificates to individual students. Instead, the TEA licenses and regulates private driver education schools, which in turn teach driver education and issue certificates. Thus, the TEA's program provides the licensure and regulation of driving education schools, not driver education

itself. Title II of the ADA therefore suggests that driver education is not a program, service, or activity of the TEA.

The Rehabilitation Act does define "program or activity," defining it as "all the operations of" a public entity. 29 U.S.C. § 794(b). In the context of interpreting this definition, we have explained that "Webster's Dictionary broadly defines 'operations' as 'the whole process of planning for and operating a business or other organized unit,' and defines 'operation' as 'a doing or performing esp[ecially] of action." *Frame*, 657 F.3d at 227 (alteration in original) (quoting Webster's Third New International Dictionary 1581 (1993)). Here, as explained above, the TEA does not operate or perform driver education because it does not teach driver education or contract with the schools that do so. Thus, driver education seems to fall outside of the ambit of the Rehabilitation Act's definition of "program or activity."

Turning to the regulations, the ADA tasks the Attorney General with promulgating regulations that implement Title II. 42 U.S.C. § 12134(a).[6] Unfortunately, these regulations do not further define what it means to be a service, program, or activity of a public entity.

The most relevant regulation is 28 C.F.R. § 35.130(b)(1)(v). Section 35.130(b)(1) provides that a public entity cannot discriminate against qualified individuals with disabilities "in providing any aid, benefit, or service," whether the state acts "directly or through contractual, licensing, or other arrangements." Subsection (v), which is not cited by the parties, provides that a state may not "[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in

---

[6] The Attorney General's regulations are eligible for *Chevron* deference. *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).

providing any aid, benefit, or service to beneficiaries of the public entity's program." 28 C.F.R. § 35.130(b)(1)(v).

But the regulations simply beg the ultimate question here. Section 35.130(b)(1) does not allow a state to discriminate "in providing any aid, benefit, or service," but it does not define what it means for the state to "provid[e]" an "aid, benefit, or service." As detailed above, the TEA does *not* provide driver education. Similarly, section 35.130(b)(1)(v) prohibits a state from aiding entities that discriminate against "beneficiaries of the public entity's program," but it does not define what it means for a program to be the "public entity's." It does not seem that a program of driver education belongs to the TEA.

Another regulation provides that "[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered." 28 C.F.R. § 35.130(b)(6). But we agree with the named plaintiffs that this statement does not automatically immunize licensed activities from the ADA's gamut, given that the regulations also provide that a public entity cannot discriminate "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1).

Looking further to the interpretative guidance provided by the DOJ, the DOJ has specifically stated that a public entity "is not accountable for discrimination in the employment or other practices of [a company licensed by the public entity], if those practices are not the result of requirements or policies established by the [public entity]." Department of Justice, Title II Technical Assistance Manual § II-3.7200, *available at* http://www.ada.gov/taman2.html (last visited Feb. 19, 2015).[7] Here, any

---

[7] The DOJ's interpretative guidance is eligible for *Skidmore* deference. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

failure of the driver education schools to comply with the ADA or Rehabilitation Act cannot be said to be "the result of requirements or policies established by the" TEA. Instead, the named plaintiffs' claim is at most that the TEA's *failure* to establish requirements or policies has allowed private driver education schools to be inaccessible. Thus, the DOJ's interpretative guidance indicates that the TEA is not accountable for the driver education schools' inaccessibility because the TEA's requirements and policies have not caused it.

Finally, as to case law, the named plaintiffs cite two lottery cases as their primary authority for finding that driver education is a program of the TEA. In those state supreme court cases, each court held that the state lottery was a program of the state lottery commission, so the ADA required the commission to make the lottery program accessible. *Winborne v. Va. Lottery*, 677 S.E.2d 304, 307–08 (Va. 2009); *Paxton v. State Dep't of Tax & Revenue*, 451 S.E.2d 779, 784–85 (W. Va. 1994). Thus, even though the inaccessible lottery agents were private parties, the commission could be held liable under the ADA because it ran a lottery program that was inaccessible as a whole. *Winborne*, 677 S.E.2d at 307–08; *Paxton*, 451 S.E.2d at 785.

But there are two important differences between these lottery cases and this case. First, there, it was clear that the lottery commissions were running lotteries, not just licensing lottery agents. After all, the lottery commissions themselves conducted the lotteries; the agents that sold the tickets were just one component of that entire program. Here, in contrast, the TEA just as clearly does not provide any portion of driver education; it merely licenses driver education schools. Second, in the lottery cases, the lottery commissions contracted with the lottery providers, which were paid commissions for acting as agents for the state. *Winborne*, 677 S.E.2d at 307; *Paxton*, 451 S.E.2d at

10

No. 14-50037

785. Here, there is no such agency or contractual relationship.[8]  These cases are therefore unpersuasive.

The only other cases that have held a public entity liable for a private actor's inaccessibility involved similar situations where the private actors had a contractual or agency relationship with the public entity.  *See, e.g.*, *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) (holding that state could be liable under ADA for inaccessibility of company it contracted with to provide state inmates with jobs); *Indep. Hous. Servs. of S.F. v. Fillmore Ctr. Assocs.*, 840 F. Supp. 1328, 1344 (N.D. Cal. 1993) (holding that "[t]he crucial distinction" that rendered the public entity liable for a private actor's inaccessibility was that the public entity "ha[d] contracted with [the private actor] for [it] to provide aid, benefits, or services to beneficiaries of the [public entity's] redevelopment program").  In the absence of such a contractual or agency relationship, courts have routinely held that a public entity is not liable for a licensed private actor's behavior.  *See, e.g.*, *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 72 (2d Cir. 2012) (holding that public entity is not liable for inaccessible taxi companies it licenses and regulates); *Bascle v. Parish*, No. 12-CV-1926, 2013 WL 4434911, at *5–6 (E.D. La. Aug. 14, 2013) (same); *Reeves v. Queen City Transp., Inc.*, 10 F. Supp. 2d 1181, 1187 (D. Colo. 1998) (holding that public utility company is not liable for inaccessible bus company it licenses where there is no contract between them); *Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1441–42 (D. Kan. 1994) (holding that city is not liable for inaccessible restaurants and liquor stores it licenses).

---

[8] The amici seem to argue that a contractual or agency relationship exists because driver education schools pay significant fees to be licensed by the TEA. We disagree. If driver education schools were acting as agents of the TEA in administering its driver education program, we would expect the *TEA* to pay the schools, not the other way around.

No. 14-50037

The importance of a contractual or agency relationship is also demonstrated by the DOJ's interpretative guidance, which provides three examples of a private actor's activities being covered by Title II because of the "close relationship" between the private actor and a public entity. *See* Department of Justice, Title II Technical Assistance Manual § II-1.3000. All three examples involve some form of contractual or agency relationship: a restaurant with a "concession agreement with a State department of parks"; a "joint venture" between a city and a private corporation; and a nonprofit organization that runs group homes "under contract with a State agency." *Id*. Thus, we conclude that the lack of a contractual or agency relationship between driver education schools and the TEA cuts strongly against holding that driver education is a program of the TEA.

The named plaintiffs essentially argue that the TEA's pervasive regulation and supervision of driver education schools transforms these schools into agents of the state. But we hold that the mere fact that the driver education schools are heavily regulated and supervised by the TEA does not make these schools a "service, program, or activity" of the TEA. Otherwise, states and localities would be required to ensure the ADA compliance of every heavily-regulated industry, a result that would raise substantial policy, economic, and federalism concerns. Nothing in the ADA or its regulations mandates or even implies this extreme result. Thus, we join the Second Circuit in holding that public entities are not responsible for ensuring the ADA compliance of even heavily-regulated industries. *See Noel*, 687 F.3d at 72 ("[C]ontrol over the taxi industry, however pervasive it is at this time, does not make the private taxi industry 'a program or activity of a public entity.'"). Beyond heavy regulation, the named plaintiffs allege only that the TEA provides sample course materials to driver education schools and sells blank driver education certificates to them. The provision of such sample course

12

materials and blank certificates is simply not enough to turn the schools into proxies for the TEA.

Admittedly, this case is further complicated by the fact that the benefit provided by driver education schools—a driver education certificate—is necessary for obtaining an important governmental benefit—a driver's license. Given the broad remedial purposes of the ADA, it would be extremely troubling if deaf young adults were effectively deprived of driver's licenses simply because they could not obtain the private education that the State of Texas has mandated as a prerequisite for this important government benefit. But this concern does not transform driver education into a TEA program or service. Instead, it is partly resolved by the fact that the ADA regulations offer a potential avenue for relief against the DPS. *See, e.g.*, 28 C.F.R. § 35.130(b)(8) (providing that a public entity cannot "apply eligibility criteria that screen out or tend to screen out" individuals with disabilities "from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered"). That is, the DPS may well be required to give exemptions to certain deaf individuals who cannot obtain driver education certificates, given that using these certificates as an eligibility criteria allegedly "screen[s] out or tend[s] to screen out" deaf people and may not be "necessary for the provision of the" driver's license program. But the named plaintiffs have not sued the DPS, so we need not decide this issue.

We conclude that the TEA does not provide the program, service, or activity of driver education. Thus, it is not required to ensure that driver education complies with the ADA.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's order denying the TEA's motion to dismiss and RENDER judgment that the case is

No. 14-50037

dismissed with prejudice for failure to state a claim upon which relief can be granted.

No. 14-50037

WIENER, Circuit Judge, concurring in part and dissenting in part:

I concur in the panel majority's holding that the named plaintiffs have standing to bring their ADA claims. I respectfully dissent on the merits, however, in the firm conviction that TEA's involvement in driver education in Texas does constitute a service, program, or activity under Title II of the ADA, which in turn requires TEA to ensure that its licensee driving schools accommodate the deaf. Convinced that the named plaintiffs have stated a claim for which relief may be granted, I would affirm the district court's judgment denying TEA's motion to dismiss and permitting the case to proceed on the merits.

## 1.     Service, Program, or Activity

This case turns entirely on whether Texas, through TEA, conducts a service, program, or activity by licensing the driving schools that train all drivers between 17 and 25 years of age who seek driver's licenses. As the majority opinion acknowledges, neither the statutes and regulations nor the case law provide a precise definition of "services, programs, or activities."[1] We differ, however, because the guidance to be derived from these sources inexorably leads me to the conclusion that the phrase is sufficiently broad and flexible to apply to TEA's licensing in this case. The indisputable truism that virtually every adult, including those between 17 and 25 years old, must have the opportunity to be licensed to drive a car (or, in Texas, a truck), given driving's unique and indispensable importance in their daily lives, confirms to me beyond cavil that TEA does in fact engage in the public "program" of driver education. That in turn warrants our mandating that TEA ensure that every driving school accommodates deaf students.

---

[1] 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

No. 14-50037

## 2.      Contract; Agency; Licensing

The majority opinion rests its holding on its perceived distinction between contractual and agency relationships, on the one hand, and licensing relationships on the other.    This to me is a classic distinction without a difference.    First and foremost, no such dichotomy appears in the text of Title II.[2]    As for the implementing regulations, if the term "services, programs, or activities" hinged on the technical legal formalities of agency or contract and distinguished them based on the formalities of licensing, such a clear rule would surely be set out in the text, not relegated to subtext.    The fact that 28 C.F.R. § 35.130 is couched in the language of standards, not rules, suggests that DOJ interprets Title II to encompass a greater set of public/private interactions than the majority opinion recognizes.    Indeed, the regulations explicitly forbid public entities from engaging in discrimination through "contractual, *licensing*, or other arrangements."[3]    Not only does 28 C.F.R. § 35.130(b)(1) specifically include licensing regimes, but the breadth of the additional, catch-all phrase, "other arrangements," cuts against the majority's narrow construction that only contractual or agency relationships qualify as programs and that licensing does not.    To me, it's not a matter of undefined labels but of the substance of each particular public/private relationship.

I also read DOJ's Technical Assistance Manual as supportive of a more expansive view of "services, programs, or activities."    Surely, if the rule to be gleaned from the four examples in section II-1.3000 were that only contractual

---

[2] *See* 42 U.S.C. § 12132.  This distinction is also entirely absent from the text of the Rehabilitation Act, which prohibits discrimination in the implementation of "any program or activity" by entities receiving federal assistance.  *See* 29 U.S.C. § 794(a); *see also Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) ("The ADA and the Rehabilitation Act generally are interpreted *in pari materia*.").

[3] 28 C.F.R. § 35.130(b)(1) (emphasis supplied).

16

or agency relationships between public and private entities could invoke dual Title II and Title III obligations, but that licensing could not, the manual would have stated so plainly. Instead, the manual makes only the general point that, "[i]n many situations, however, public entities have a *close relationship* to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles."[4] "Close relationship" is not synonymous with or restricted to "contractual or agency relationship," and I am reluctant to so narrow DOJ's language. Rather, I see the four illustrations that follow not as delineating the outer limits of what constitutes a "close relationship," but as presenting four non-exclusive, typical examples of public-private interactions—non-exclusive examples that occur often in the real world and thus are useful to include as illustrations. The driver education system at issue here, however, is *sui generis*—atypical if not unique—so it is unsurprising that the manual presents no close analogy. What the manual does do, however, is instruct us to focus on the closeness of the particular relationship—here, the one between TEA and private driving schools—not on the legalistic labeling of the relationship as licensing.

Finally, the panel majority's perceived distinction between contractual and agency relationships and licensing relationships is nowhere apparent in the limited case law on this issue. It may well be that a contractual or agency relationship is a sufficient condition to finding that a public entity's program encompasses a private entity's activities, but it is neither the only one nor a

---

[4] DEP'T OF JUSTICE, THE AMERICANS WITH DISABILITIES ACT TITLE II TECHNICAL ASSISTANCE MANUAL COVERING STATE AND LOCAL GOVERNMENT PROGRAMS AND SERVICES § II-1.3000 (1993) (emphasis supplied), *available at* http://www.ada.gov/taman2.html.

necessary one.[5]  The critical issue is not whether a contract exists,[6] but (1) whether a private party services the beneficiaries of the public entity's program, and (2) how extensively the public entity is involved in the functions and operations of the private entity.  If the private entity does so serve, and the public and private entities are closely intertwined, then under those particular circumstances, the private entity's activities might be fairly considered an integral and inseparable part of the public entity's program.

### 3.    TEA and Driving Schools Are Inextricably Intertwined

The crux of the plaintiffs' case (and mine!) is that, even though the driving schools perform the actual day-to-day instruction, instruction is but one component of the broader program of driver education that is continually overseen and regulated in discrete detail by TEA.  When Chapter 1001 of the Texas Education Code is considered as a whole, it reveals that TEA superintends a wide-ranging driver training program in support of Texas's

---

[5] *See Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 636 (D. Md. 2010) (allowing a Title II claim against a city for its failure to ensure that private entities participating in the city's alcohol awareness program were ADA compliant, though no contract appears to have existed between the city and the private entities).

[6] *See Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) ("Title II's obligations apply to public entities *regardless of how those entities chose to provide or operate their programs and benefits*." (emphasis supplied)).  The majority appears to read *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F. Supp. 1328, 1344 (N.D. Cal. 1993), as making a "crucial distinction" between a state development agency, which might be liable under Title II for a private housing development's discriminatory practices, and a fire department, which would not be (even if it saved the development from a fire, thus rendering it "significant assistance"), on the basis of the agency's contract with the housing development, and the fire department's lack of a contract.  The court in *Independent Housing* noted "that the fire department has not contracted with [the housing development] for [it] to provide any aid, benefit, or service to beneficiaries of the fire department's program," whereas the state agency "has contracted with [the housing development] for [it] to provide aid, benefits, or services to beneficiaries of the [a]gency's redevelopment program."  *Id.*  In my view, the "crucial distinction" in *Independent Housing* is the fact that the public entity used a private entity to implement its urban renewal program, not that this arrangement was formalized in a contract.

overarching policy goal of ensuring safe roads for all. Chapter 1001 does not merely establish TEA's authority over driver *education*—and consequently, its role as gatekeeper to the uniquely pervasive and indispensable state function of licensing its drivers—but also the agency's role in ensuring driving *safety*. The named plaintiffs do not discuss driving safety schools, but it is notable that Chapter 1001 gives TEA oversight of both driver *education* and driving *safety*, under the general umbrella of driver *training*.[7]

TEA plays a significant hands-on role in licensing drivers, but its role in driving safety is anything but remote or marginal. For example, Texans who receive specified minor traffic tickets may have those tickets dismissed if the drivers complete a driving safety course certified and licensed by TEA.[8] The way that the state interfaces driver training and the receipt of state benefits indicates that its intimate participation at all levels of the private driving school industry is more than merely regulatory. Through TEA, the state employs and manages this industry to achieve its own public ends. Again, the fact that the state's active involvement in this industry is labeled licensing does not diminish, much less block, its qualifying as a program of the state for the purposes of the ADA.

4.     **TEA's Role**

---

[7] *See* TEX. EDUC. CODE § 1001.001(9) (defining a "driver training school" as a "driver education school or driving safety school").

[8] *See Information for Driving Safety Class Participants*, REGION 13, http://www4.esc13.net/drivers/faqs-drivers/idsinfo (last visited Mar. 24, 2015). Some automobile insurance companies also provide discounts for individuals who have completed such a course, a public-private interaction that TEA facilitates. *See id.*; *see also* EDUC. § 1001.105 (requiring TEA to "enter into a memorandum of understanding with the Texas Department of Insurance for the interagency development of a curriculum for driving safety courses").

No. 14-50037

The powers granted to TEA in Chapter 1001 further support the view that private driving instruction forms one component of an overall state program. This is because TEA exerts more rigorous oversight of providers of driver education than would be expected in most run-of-the-mill licensing regimes. Every driving school's curriculum must be approved by TEA, and the agency "designate[s]" the textbooks that may be used.[9] Furthermore, TEA's enforcement powers over driver education schools are broad and varied[10]—its power to order a peer review, for example, suggests a greater degree of involvement in the driving schools' operations than is typical of a plain vanilla licensing arrangement.[11] The requirement that driving school owners and staff be of "good reputation and character" signals a heightened level of concern for the reliability of these schools' services—a concern that is consistent with TEA as a public provider of a social services program.[12] Similarly, the fact that each driver education school must post a significant bond, payable to TEA for its direct use in paying refunds to students, portrays a higher and more intimate level of agency involvement in these licensees' activities than would

---

[9] EDUC. § 1001.101(a).

[10] *See id.* § 1001.454(a) ("The commissioner may revoke the license of a driver training school . . . or may place reasonable conditions on the school . . . if the commissioner has reasonable cause to believe that the school . . . has violated [Chapter 1001 or a rule adopted under it]."); *id.* § 1001.456(a) ("[T]he agency may, without notice: (1) order a peer review; (2) suspend the enrollment of students in the school or the offering of instruction by the instructor; or (3) suspend the right to purchase driver education certificates."); *id.* § 1001.553 (noting that the commissioner may separately impose administrative penalties of up to $1,000 per day per offense on schools found in violation of the chapter or the rules adopted under it); *see also id.* § 1001.153(a) (allowing the commissioner to set a fee for investigating complaints against a school, payable by schools that are ultimately found to be at fault).

[11] *See id.* § 1001.456(a). A peer review is an "objective assessment of the content of the school's . . . curriculum and its application," "conducted by a team of knowledgeable persons selected by the agency," and paid for by the school under review. *Id.* § 1001.456(c).

[12] *Id.* § 1001.204(9).

20

be expected if TEA were purely a hands-off licensing entity.[13]  And TEA has the right to inspect every school physically at least once a year as a condition of license renewal[14]—more frequently if the school has a history of regulatory violations.[15]

Beyond TEA's intertwined involvement with driver education schools, however, is the fact that through TEA the state also employs driver training to teach civic responsibility, including lessons having nothing to do with the mechanics of driving.  Chapter 1001 requires TEA to ensure that information about litter prevention[16] and organ donation[17] is included in all driving courses certified by the agency.  That the Texas Legislature has chosen to promote these important civic and community values through the vehicle of driver training is another indication that the private driving school industry participates in a public program of TEA.[18]

All of this makes abundantly clear that driver education is not merely a passively licensed, private, for-profit industry, but constitutes a means by which TEA substantively and substantially effectuates the policy goals that

---

[13] *See id.* § 1001.207.

[14] *See id.* § 1001.303.

[15] *See id.* § 1001.454(c).

[16] *See id.* § 1001.107.

[17] *See id.* § 1001.108.

[18] In section 1001.111, there is even more evidence that the state sees good driving habits as a component of good citizenship.  For drivers younger than 25, driving safety courses take on the attributes of civic education.  Students are not just instructed on traffic rules.  In addition, they are educated on "the role of peer pressure," *id.* § 1001.111(b)(2)(D), "the effect of poor driver decision-making on [their] family, friends, school, and community," *id.* § 1001.111(b)(2)(E), and the importance of assertiveness, as drivers and as passengers, *see id.* § 1001.111(b)(2)(F).  They must also sign "a written commitment . . . to family and friends that the student will not engage in dangerous driving habits."  *Id.* § 1001.111(b)(3).  Implicit in these requirements is the idea that a responsible driver is a responsible citizen.  To be clear, driver education courses, not driving safety courses, are at issue in this case; Chapter 1001, however, covers both driver education and driving safety as two parts of an overall driver training program managed by TEA.

the state has charged it with implementing and maintaining. The fact that driver education forms part of the academic curriculum in some public schools only reinforces the conclusion that this entire infrastructure is truly a "program" of the state of Texas.

As the panel majority acknowledges, 28 C.F.R. § 35.130(b)(1)(v) is the regulation that is most relevant to this case. It contemplates precisely the instant situation: A public entity may well discriminate indirectly by furnishing significant assistance to a private entity that discriminates directly by failing to provide the public entity's program to disabled beneficiaries. The regulation, in other words, covers a public entity that farms out the practical implementation of its program to private entities while retaining and exercising considerable oversight, regulation, and other substantive involvement. In this case, the driving school students are the direct beneficiaries of TEA's program, and TEA furnishes operating licenses and course completion certificates to private schools that in turn discriminate on the basis of disability. In my view, the plaintiffs have stated a viable cause of action: The State of Texas cannot legislatively mandate driver education, then evade ADA responsibility via a "flea-flicker" lateral from TEA to private licensees.

## 5.    "Parade of Horribles" Is Inapt

TEA claims that affirming the district court in this case could lead to requiring the state to police ADA compliance by all heavily regulated, licensed industries, such as massage parlors and tattoo artists—a typical "parade of horribles" frequently advanced by desperate public defendants. That may well be, but the one and only issue before us today is the discrete driver education scheme mandated by the Texas legislature and created and administered by TEA. It is sufficiently distinct and distinguishable from all others that

No. 14-50037

affirming the district court surely will not open those floodgates. There exist obviously meaningful differences between this particular public/private operation and virtually every other private operation that Texas licenses. TEA's role is not just about consumer protection, as is the focus of the several occupational codes cited by the state. I repeat here for emphasis that, in this day and age, the driving of private and personal vehicles is a uniquely important, pervasive, and indispensable entitlement, and driving responsibly is a civic duty that the state seeks to promote with this unique regulatory scheme that it entrusts to TEA. Nothing about this is changed by the fact that state-licensed driver education schools happen to be private enterprises.

To illustrate this distinction between driver education and essentially all other heavily regulated businesses and industries, consider a hypothetical world in which every driver education school in Texas shuts down, so that no person under the age of 25 could obtain a driver's license via private instruction. Texas would undoubtedly fill the void itself—perhaps by adding courses at community colleges and expanding the driver education programs that currently exist in its public schools. But if, by contrast, each and every massage therapist or tattoo artist school in Texas were to close, the state surely would not respond by entering the business of training massage therapists or tattoo artists. Unlike driver education schools, those industries do not serve as private mechanisms for achieving public ends and public policy.

Viewing the case law from this perspective, the distinction becomes even more apparent. Liquor stores,[19] buses to gambling and ski resorts,[20] and taxi cabs[21] are not services of the state. Like Kansas, Colorado, and New York,

---

[19] *See Tyler v. City of Manhattan*, 849 F. Supp. 1429 (D. Kan. 1994).

[20] *See Reeves v. Queen City Transp., Inc.*, 10 F. Supp. 2d 1181 (D. Colo. 1998).

[21] *See Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012).

No. 14-50037

Texas might well regulate these industries, but it is not likely to replicate them. Again, the feature that sets driver education apart from all the rest is the pervasiveness of driving private vehicles in a state like Texas. States regulate other industries to prevent unlicensed operators from doing harm. In contrast, driver education alone is a positive good and an end unto itself. Texas has chosen to educate drivers via private driving schools, and it regulates this private industry not simply to protect consumers from unlicensed operators, but first and foremost to ensure that important training goals for this large segment of the state's adult population are met to the state's satisfaction. Texas has an inherent interest in driver education that it does not have in any of the other licensed endeavors, accounting for its extensive involvement through TEA.[22]

Finally, I acknowledge the concern that requiring TEA to take a more active role in promoting handicap accessibility in driver education would unduly expand its role. True, it may well impose an unanticipated ADA burden on the agency. Yet Congress made the conscious calculation to impose this burden on public entities. In light of this nation's unseemly history of systematically excluding persons with disabilities from public life and public activities, Congress intentionally wrote the ADA "to provide a clear and *comprehensive* national mandate for the *elimination* of discrimination."[23] It

---

[22] Cases in which Title II has been held to apply to public entities supervising the activities of private industries consistently involve issues of inherent state interest, such as health care and education. *See, e.g.*, *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 636 (D. Md. 2010) (allowing a deaf plaintiff's Title II claim to proceed after a city did not provide interpreters to probationers who were required to attend private alcohol awareness classes, including a victim impact panel sponsored by Mothers Against Drunk Driving); *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 317–18 (E.D.N.Y. 2009) (ruling that Title II covered a state entity that licensed private entities to operate adult homes for individuals with disabilities).

[23] 42 U.S.C. § 12101(b)(1) (emphases supplied).

## No. 14-50037

might not be convenient for TEA to require ADA compliance by its licensed driver education schools, but the ADA's sweeping purpose is clear.[24] And, after all, TEA may rely on the ADA's safety valve of reasonableness. Although TEA is obligated to make "reasonable modifications in policies, practices, or procedures," if it finds that such modifications are too strenuous, it may "demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," and be excused from compliance.[25] A public entity's obligations under Title II are broad, but they are not unlimited.

For the foregoing reasons, I respectfully dissent from the panel majority's reversal of the district court's denial of TEA's motion to dismiss.

---

[24] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) ("The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001))).

[25] 28 C.F.R. § 35.130(7).